UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 2004-CV-10338-JLA

SAMUEL WILLIAMS, PPA DAVID WILLIAMS,
DAVID WILLIAMS, AND
TARA WILLIAMS,
Plaintiffs

V.

GREATER BOSTON HOTEL EMPLOYEES, LOCAL 26/
HEALTH AND WELFARE TRUST FUNDS BOARD OF TRUSTEES,
Defendant

**ORDER ON
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
(Docket # 23)
AND
DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT
(Docket #24)**

ALEXANDER, M.J.

Plaintiffs David and Tara Williams brought this case on behalf of themselves and their minor son Samuel against Greater Boston Hotel Employees, Local 26 Health and Welfare Trust Funds Board of Trustees, pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), appealing an arbitrator's decision to uphold the denial of health insurance benefits for Samuel Williams. After the defendant's motion to dismiss was denied by the District Court, the parties consented to have a Magistrate Judge

conduct all further proceedings in the case. The parties also agreed that the case could be decided on cross-motions for summary judgment, and a summary judgment motion hearing was held on April 6, 2005. After carefully considering both parties' written and oral remonstrations, and for the reasons set forth more fully below, this Court DENIES the plaintiffs' motion for summary judgment and ALLOWS the defendant's cross-motion for summary judgment.

**BACKGROUND**

David Williams was hired by the Colonnade Hotel ("the Hotel") in April 1998 as a server in its 'Brasserie Jo' Restaurant. He enrolled in the medical insurance plan offered through the Hotel as a single member, with coverage effective on July 7, 1998.

The Hotel offered medical insurance through Greater Boston Hotel Employees, Local 26, administered by the Health and Welfare Trust Funds Board of Trustees ("the Trustees").[1] The Trustees established a multi-employer welfare benefit plan, called the Preferred Provider Plan ("the Plan"), to provide payment or reimbursement of medical expenses for eligible hotel employees (and their enrolled dependents) from a number of hotels in the Boston area. All benefits are

---

[1] Greater Boston Hotel Employees is a union that represents workers in Boston's hotel, restaurant, and food service industries. Hotel Employees Restaurant Employees Union Local 26, *Boston Hotel Employees and Restaurant Employees Union: Local 26*, at http://www.bostonhotelunion.org (visited June 18, 2005).

directly funded through the Trustees, who have the sole responsibility and liability for the payment of benefits.

The Trustees outsource the administration of the Plan to MED TAC Corporation, a third party administrator that handles claim processing. Additionally, the Trustees utilize the services of Modern Assistance Programs, Inc. ("MAP"), a case management organization company. Employees who are insured under the Plan must contact MAP according to the schedule of medical benefits for approval of certain services in order to be covered. The schedule of medical benefits and information about MAP is located in the Plan Document, the Plan's policy handbook, which is provided to Plan participants by the Trustees. The Trustees generally send both the Plan Document and an insurance card to the participant address on file by the time the participant's coverage is effective.

The Plan Document that was in effect at the times relevant to the Williamses' claims was sent to all Plan participants in December 1999. Additionally, prior to February 2000, new MED TAC insurance cards were mailed to all Plan participants. The cards stated "CONTACT MAP...PRIOR TO HOSP. ADMIT." Nothing in the record before this Court suggests that David did not receive the Plan Document or a new insurance card. In fact, the arbitrator found that at some point prior to Tara's admission to the hospital for Samuel's birth and

3

Samuel's admission to the hospital for his surgery, David used his MED TAC card to contact MAP according to Plan procedure.

In December 2001, David and his girlfriend Tara found out that they were expecting a baby.[2] In February 2002, David and Tara learned that the baby (Samuel) was going to be born with a congenital birth defect called gastroschisis, and that he would likely require surgery immediately after his birth. David then contacted the Human Resources department at the Hotel to inquire about changing his insurance status to add both Tara and their unborn child as dependents. David informed Human Resources of Samuel's condition and the high likelihood that Samuel would require extensive medical attention upon his birth.

The plaintiffs allege that David changed his insurance coverage from the single plan to the family plan policy, which would provide coverage for David, Tara, and Samuel, who was not yet born. The Trustees claim, however, that on March 21, 2002, David filled out a form to add Tara to the Plan at the "single plus one" rate, effective upon their marriage. Regardless of the type of Plan that David was officially enrolled in, the basis of the Williamses' claim is that David was assured by Human Resources that his family would be covered under the Plan.

---

[2] Tara was David's girlfriend at the time Tara became pregnant. They were later married, in April 2002.

4

In April 2002, after David and Tara were married, David contacted Human Resources to confirm that he was switched to the family plan because he wanted to be sure that Samuel would get immediate coverage upon his birth. David asserts that he was reassured that his "family's insurance needs were taken care of." Neither David nor Tara, however, received any new insurance cards or policy handbooks explaining their coverage or Plan procedures. David, therefore, again went to Human Resources to ensure that his family was fully covered, at which time he was reassured that they were and that they were to use their social security cards for insurance identification until they received their new cards.

In July 2002, David contacted MED TAC to discuss his coverage. He also inquired about procedures to be followed after Samuel's birth and was advised that the hospital would be responsible for contacting MED TAC to notify them that Samuel had been born. On August 10, 2002, Tara gave birth to Samuel at Bringham and Woman's Hospital in Boston. Samuel was then transferred to Children's Hospital Boston for surgery. Neither David nor Tara called MAP before Tara and Samuel were admitted to either hospital.

The Plan Document expressly lists requirements for policy holders regarding maternity and newborn care, as well as hospital admissions. Section 1.2, entitled "CONDITIONS OF PAYMENT" reads in bold, capital letters:

> SPECIFICALLY, MODERN ASSISTANCE PROGRAMS, INC. (MAP) IS A UTILIZATION REVIEW AND CASE MANAGEMENT ORGANIZATION THAT MUST BE CONTACTED FOR APPROVAL OF CERTAIN SERVICES IN ACCORDANCE WITH THE SCHEDULE OF MEDICAL BENEFITS, INCLUDING ALL HOSPITAL ADMISSIONS . . . IF MAP DOES NOT APPROVE SUCH SERVICES AS REQUIRED, THEN NO BENEFITS ARE PAYABLE FOR THESE SERVICES. IN ADDITION, PREGNANT WOMEN MUST CONTACT THE TRUST OFFICE AND ENROLL IN THE HEALTHY BABY PROGRAM. IF THE TRUST OFFICE IS NOT CONTACTED AS REQUIRED FOR MATERNITY AND NEWBORN BABY CARE SERVICES, THEN NO BENEFITS ARE PAYABLE FOR THESE SERVICES.

These requirements are explained again in Section 2.1, "COST CONTAINMENT PROGRAMS," within the "SCHEDULE OF MEDICAL BENEFITS," and within the "DEFINITIONS" section, as well as in various other locations throughout the Plan Document.

Additionally, Section 4.2.3 of the Plan Document provides:

> The Eligibility Date for children born to a Member after He becomes a Covered Person is the Newborn Baby's date of birth. In the event the Newborn child is being added to a single policy, an enrollment change form must be submitted in order to enroll the child. In the event the Newborn child is being added to a Family policy, an enrollment change form is also required to enroll the child.

Regarding plan limitations for preexisting conditions (e.g., Samuel's gastroschisis), the Plan Document states in Section 6.2.1: "The [denial of coverage for preexisting conditions] will not apply to a Newborn Baby . . . previous to His

6

enrollment in this Plan if . . . the Newborn Baby . . . is enrolled in this Plan within thirty (30) days of His Eligibility Date."

Within one week of Samuel's birth, the Hotel's Director of Human Resources reminded David to enroll Samuel in the Plan, according to the above Plan policy, so that Samuel would be covered. David said he knew that he had to do so, but did not fill out the enrollment forms for Samuel until September 17, 2002. Despite David's delay, an employee in Human Resources submitted a letter to the Trust office to help secure coverage for Samuel effective the day of his birth, stating that David's delay was due to a clerical error. David, however, told Human Resources that he purposely waited to enroll Samuel in the Plan because Tara had Harvard Pilgrim insurance through her ex-husband and that David and Tara were choosing between the plans once the baby was born.

## DENIAL OF BENEFITS

David and Tara sought payment for expenses stemming from Samuel's birth and subsequent surgery, but their claims were denied by MED TAC. MED TAC denied the claims on the basis that Tara had not enrolled in the Healthy Baby Program and that MAP was not contacted prior to any hospital admissions. Following the denial, David explained to a Trustees administrator that he had assumed that Samuel's coverage had been taken care of based on reassurances

from Human Resources. The Trustees administrator told David that it was still David's responsibility to contact MAP as printed on his insurance card.

David and Tara appealed the denial of benefits. On January 30, 2003, MED TAC responded, stating that the claims were denied because of David's and Tara's failure to enroll in the Healthy Baby Program and their failure to contact MAP before any hospital admissions. In August 2003, the Williamses commenced a second appeal and requested a hearing with the Trustees. The Williamses were notified on October 1, 2003, that the Trustees had granted them a hearing, scheduled for October 8, 2003. The Williamses attended the hearing and presented a written summary of their case. The Trustees' administrator then informed the Williamses that the Trustees had decided to initiate the internal dispute resolution process, according to Section 7.4 of the Plan Document. Section 7.4 states:

> The [adverse claim] decision of MED TAC [on appeal] will be subject to the instructions of the Trustees, who may appoint an individual or a committee of individuals to serve as Claims Reviewer. In the absence of such appointment, the Trustees will be the Claims Reviewer. The Claims Reviewer shall have discretionary authority to interpret and apply the terms of the Plan to specific claims on a consistent basis for all similarly situated Claimants. The decision of the Claims Reviewer in this review will be final and binding upon MED TAC, the Trustees and all Claimants under the Plan.

The Trustees enlisted the assistance of a neutral arbitrator to act as the Claims Reviewer. On November 25, 2003, the arbitrator issued his opinion upholding the denial of Samuel's benefits based on the Williamses' failure to enroll in the Healthy Baby Program and failure to seek approval from MAP before hospital admissions. The arbitrator based his determination on the Williamses' failure to comply with two mandatory requirements of the Plan.

He stated that "[t]here can be no question that the Summary Plan Description given to members when they enroll in the . . . Plan clearly, unequivocally and repeatedly advises members that they are required to contact the Trust Office as soon as they or a covered dependant's pregnancy is confirmed and enroll in the Healthy Baby Program." Additionally, "[the MAP approval requirement] is reiterated <u>four</u> times in the Summary Plan Description" and is stated on the MED TAC insurance card, which the arbitrator found that David had previously used according to protocol.

## ANALYSIS

### Standard of Review

The Williamses sought review of the arbitrator's decision pursuant to § 1132(a)(1)(B) of ERISA, which states that "[a] civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his

9

plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." The statute does not provide a standard of review for actions brought under § 1132(a)(1)(B), and the federal courts have therefore adopted the "arbitrary and capricious" standard from provisions of the Labor Management Relations Act, 29 U.S.C. § 186 (1947). Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 (1989).

The Court in Firestone held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Id. at 115. When plan administrators have discretionary authority, courts in this Circuit apply the "arbitrary and capricious standard" to judge the actions taken by plan administrators regarding benefit claim determinations. DePina v. Gen. Dynamics Corp., 674 F. Supp 46, 51 (D. Mass. 1987). This deferential standard was adopted to further ERISA's goal of achieving the final resolution of complaints at the administrative level. Id. at 49 (citing King v. James River-Pepperell, Inc., 592 F. Supp 54, 55-56 (D. Mass. 1984)).

The arbitrary and capricious standard "is not self-defining and has been applied inconsistently by different jurisdictions," and "[t]he substance of the

test is . . . far from clear." DePina, 674 F. Supp at 51. In examining an administrator's decision, however, the courts "need not be convinced that the . . . approach is the only one or the best way to plan and maintain the integrity of [a] fund. [Courts] need only be convinced that it is a rational one and is supported by a reasonable reading of the regulations." Id. (citing Rueda v. Seafarers Int'l Union of North America, 576 F.2d 939, 943 (1st Cir. 1978)).

Section 7.4 of the Plan Document entrusts the Trustees with the discretionary authority to review claims or to appoint a third party to do so. The Williamses therefore conceded, based on the language of the Plan, that the arbitrator's decision is to be reviewed under the "arbitrary and capricious" standard.

Additionally, the parties have agreed to have their case decided on cross-motions for summary judgment. Summary judgment in an ERISA denial of benefits case is used as "a mechanism for tendering the issue and no special inferences are to be drawn in favor of [the resisting party] . . . ." Liston v. Unum Corp. Officer Severance Plan, 330 F.3d 19, 24 (1st Cir. 2003). Therefore, "the district court sits more as an appellate tribunal than as a trial court. It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." Leahy v.

Raytheon Co., 315 F.3d 11, 18 (1st Cir. 2002). With these parameters in mind, the Court turns to the parties' assertions.

**Express Language of the Plan Document**

In reviewing the arbitrator's examination of the evidence, "[t]he arbitrary and capricious standard asks only whether a factfinder's decision is plausible in light of the record as a whole, or, put another way, whether the decision is supported by substantial evidence in the record." Leahy, 315 F.3d at 17 (citations omitted). The basis of the arbitrator's decision was the Williamses' failure to comply with two express, mandatory procedural requirements set forth by the insurers for Plan participants to follow in order to receive benefits.

The arbitrator relies on various sections within the Plan Document and the MED TAC insurance card to highlight where the requirements can be found, and then refers to the language that explicitly states that benefits will be not be payable unless these procedures are followed. There is no evidence that the Williamses followed the Plan procedures; thus, based on explicit language within the Plan Document itself, the Williamses are not entitled to receive payment for benefits. The arbitrator's decision, supported by substantial evidence in the record that the Williamses were not in compliance with Plan procedures, was not arbitrary and capricious.

**ERISA Notice Requirements**

The Williamses present two other bases for finding the arbitrator's decision arbitrary and capricious, and although the Court has found that substantial evidence supports the arbitrator's decision, it addresses both of the Williamses' additional arguments.

The Williamses contend that the arbitrator's decision was arbitrary and capricious because it did not account for the fact that they were not provided with Plan information, as required by ERISA. The Williamses assert that without the Plan information, they could not be expected to comply with the Plan procedures. Indeed, ERISA contains provisions that require administrators to provide participants with information, including summary plan descriptions such as the Plan Document. See generally 29 U.S.C. §§ 1021, 1024. A Plan participant may bring a cause of action against an administrator who fails to provide such information upon a participant's request pursuant to 29 U.S.C. § 1132(a)(1)(A).

ERISA requires that fiduciaries follow a "prudent man standard of care" and act solely in the interest of participants and beneficiaries of a plan. 29 U.S.C. § 1104. However, "[a]bsent a promise or misrepresentation, the courts have almost uniformly rejected claims by plan participants or beneficiaries that an ERISA

administrator has to volunteer individualized information taking account of their peculiar circumstances." Watson v. Deaconess Waltham Hosp., 298 F.3d 102, 112 (1st Cir. 2002) (citing Barrs v. Lockheed Martin, 287 F.3d 202, 207-08 (1st Cir. 2002)). The notice provisions were not intended to "create a system of strict liability for formal notice failures." Terry v. Bayer Corp, 145 F.3d 28, 39 (1st Cir. 1998). A technical violation of these provisions only gives substantive remedies beyond those provided in 29 U.S.C. § 1132(c), which the Williamses are seeking to recover, if there is evidence of bad faith, active concealment, or fraud. Watson, 298 F.3d at 113. Additionally, failure to provide participants with information is a breach of an administrator's fiduciary duty only if the administrator should have known that such failure would be harmful. Id. at 114-5.

The Williamses aver that in failing to provide a new Plan Document and insurance card to Tara, the Trustees, through Human Resources, breached their fiduciary duty because the Trustees should have known that the failure to inform the Williamses would be detrimental. There is no evidence in the record before the Court, however, that Human Resources was actively concealing information or had reason to believe that the Williamses were unaware of the required procedures. The Williamses have not shown that they requested information and never received it.

The Williamses also contend that Human Resources' reassurances that David's family was covered were made in bad faith, and that withholding payment for insurance and not providing coverage was also done in bad faith. The Williamses assert that substantive remedies are available under ERISA on this basis. The record indicates, however, that the comments made by Human Resources were regarding enrollment procedures and were not intended to misinform David about procedural requirements, nor were they meant to act as a substitute for information included in Plan documents. Additionally, David's contribution to coverage for Tara would have entitled them to benefits if they had followed Plan procedures. Furthermore, David did not enroll Samuel in the Plan when he was advised to do so by the Hotel's Director of Human Resources after Samuel's birth. He waited over a month after Samuel's birth to enroll Samuel in the Plan, even though he claimed to be aware of the procedures and was reminded of them by Human Resources staff.

Although discrepancies regarding what the Williamses knew or should have known about Plan procedures and what consequences Human Resources staff might have expected from their failure to inform the Williamses about specific procedures may exist, "the mere existence of contradictory evidence does not render a plan fiduciary's determination arbitrary and capricious." Leahy, 315 F.3d

at 19 (citing <u>Vlass v. Raytheon Employees Disab. Trust</u>, 244 F.3d 27, 30 (1st Cir. 2001). The reassurances by Human Resources to the Williamses regarding the family's insurance coverage may have misled David into believing that he need not take further action to secure payment for benefits. The record does not suggest, however, that there has been a breach of fiduciary duty, that there was bad faith by the Trustees, or that the Williamses' lack of knowledge regarding the Plan was the fault of the Trustees. The Williamses' assertion that they did not know the procedures or have the information is unavailing.

**Public Policy**

The Williamses also contend that public policy considerations based on the Trustees' fiduciary duty to Plan participants warrant finding that the arbitrator's decision was arbitrary and capricious. The Williamses point to the unfairness of denying their family health insurance benefits when they have clearly paid their insurance premium. Additionally, the Williamses state that the exorbitant sum of medical expenses they owe because of the denial of benefits, which is exactly what they were hoping to avoid by insuring their family, offers a sound public policy basis for granting them the benefits they have paid for.

When extenuating circumstances exist, according to the Williamses, there should be exceptions to following express Plan language. Imposing liability on

administrators for formal notice failures and based on unpredictable interpretations of plan policies, however, would "necessarily increase costs, discourage employers from offering plans, and reduce benefits to employees." Barrs, 287 F.3d at 207-08.

The Williamses assertion that following Plan procedures would have made no difference in the outcome of their child's prognosis may be correct, but the Trustees maintain that Plan procedures were designed to minimize costs and organize caseloads, and are not meant to be individualized. The arbitrator's decision was based on the express language in the Plan rather than on a forced interpretation of it, and is therefore not arbitrary and capricious.

In reviewing the arbitrator's affirmation of the denial of the Williamses' benefits, the Court "may not simply substitute its opinion for that of the plan administrator." Fletcher-Merrit v. NorAm Energy Corp., 250 F.3d 1174, 1180 (8th Cir. 2001). An administrator's denial of benefits may be arguable, but unless an arbitrator's affirmation of this denial is arbitrary and capricious, it cannot be reversed. See Bekiroglu v. Paul Revere Life Ins. Co., 223 F. Supp. 2d 361, 365 (D. Mass. 2002); Brigham v. Sun Life of Canada, 317 F.3d 72, 82 (1st Cir. 2003). Because the arbitrator's decision was not arbitrary and capricious, it is entitled to deference by this Court.

## CONCLUSION

For the foregoing reasons, this Court DENIES the plaintiffs' motion for summary judgment and ALLOWS the defendant's cross-motion for summary judgment.

SO ORDERED.

_7/28/05_  
Date

_[signature]_  
United States Magistrate Judge